22CA1703 Peo v Martinez 02-13-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1703
City and County of Denver District Court No. 14CR10285
Honorable Edward D. Bronfin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Teresa Martinez,

Defendant-Appellant.

ORDER AFFIRMED

Division I
Opinion by JUDGE YUN
J. Jones and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Andrew Gargano, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Teresa Martinez appeals the postconviction court's order denying her Crim. P. 35(c) motion after a hearing. She contends that the court erred by finding that her conviction from a guilty plea was not barred by the statute of limitations and that the court abused its discretion by denying her request for discovery sanctions. We reject these contentions and affirm the order.

## I.     Background

¶ 2     In 2006 and 2007, Martinez and her family ran a fraudulent mortgage scheme through their business, Worldwide Mortgage, Inc., and related family-run business entities (collectively, Worldwide). The scheme generally worked as follows:

(1)  Worldwide would purchase a residential property by securing a mortgage in a straw buyer's name (often through false representations on the loan application). Worldwide would cover the down payment and handle closing on the property; the straw buyer would not live in the home, take possession of the keys, or pay the mortgage.

(2)  Several weeks later, Worldwide would locate a second straw buyer to purchase the property from the original

straw buyer at an inflated price. Worldwide would again secure a mortgage, cover the down payment, and handle the closing process.

(3) The profits from the sale would be diverted away from the first straw buyer via "a private payoff letter" — a document directing the title company to pay a portion of the proceeds from the sale to somebody other than the seller — and into the bank account of a member of the Martinez family (often Martinez herself). The money would then be rerouted into a different bank account controlled by Worldwide.

(4) The second straw buyer would not make the required mortgage payments, and the lender would foreclose on the property.

Martinez herself acted as the initial straw buyer for two pieces of property purchased and sold under this scheme.

¶ 3 In 2011, the Colorado Bureau of Investigation (CBI) began a lengthy investigation into Worldwide after it received a tip on its fraud hotline from the bank that refinanced one of Worldwide's offices. In 2012, after that bank successfully foreclosed on the

2

office, CBI gained access to over two hundred boxes of transaction files that were abandoned by Worldwide. Mortgage and financial fraud specialists with CBI spent months evaluating the documents and eventually uncovered the straw buyer scheme.

¶ 4 In 2014, the Martinez family members were each indicted for their roles in the scheme. Martinez, for her part, was charged with violations of the Colorado Organized Crime Control Act (COCCA), theft, and conspiracy to commit theft, all predicated on the purchase and sale of eleven properties. In exchange for the dismissal of these charges,[1] Martinez pleaded guilty to one count of criminal mischief.

¶ 5 Martinez thereafter filed a Crim. P. 35(c)(2)(III) motion alleging, as relevant here, that the district court was without subject matter jurisdiction to enter a conviction on her guilty plea because the statute of limitations barred the charges against her.[2] Specifically,

---

[1] The conspiracy to commit theft charge was dismissed for other reasons before the plea bargain and is not relevant to this appeal.
[2] Martinez's court-appointed counsel did not proceed on any of the other claims in Martinez's pro se Crim. P. 35(c) motion. Accordingly, those claims were abandoned. *See People v. Smith*, 2024 CO 3, ¶ 20 ("[A] conscious decision not to pursue the omitted pro se claims . . . constitutes an abandonment of those claims.").

she argued that the victims (the lenders and the straw buyers) and the State of Colorado — through the Department of Regulatory Agencies (DORA) and its Division of Real Estate — all knew or should have known of the facts establishing the criminal charges against her more than three years before the indictment was filed. Martinez also moved for sanctions for spoliation of evidence based on DORA's response to her postconviction subpoena.

¶ 6 The postconviction court held an evidentiary hearing. Martinez called a single witness to authenticate some of the voluminous records she had submitted to the court — reports from the CBI's and DORA's investigations, transcripts from the grand jury proceedings, and documents subpoenaed from the lender victims — but otherwise rested on those exhibits and her arguments. The People, on the other hand, called an analyst from CBI who worked on the Worldwide case to testify about how the investigation unfolded. The evidence admitted during the hearing and the postconviction court's rulings are summarized as follows.

(1) DORA

¶ 7 Between 2009 and 2011, DORA engaged in a regulatory investigation into Worldwide and its employees in response to

4

consumer complaints filed against the company. These complaints stemmed from Worldwide's retention of unearned fees, failure to provide the keys to a newly purchased home, and the practice of real estate or loan generation by unlicensed individuals — including Martinez. As a result of the investigation, multiple Worldwide employees had their real estate licenses revoked or suspended, and Martinez was sent an order to cease and desist from unlicensed activities.

¶ 8    The postconviction court found that DORA learned during its investigation that

> (1) Worldwide engaged in transactions involving falsified documents and incomplete loan applications, (2) unlicensed individuals worked at Worldwide, (3) Worldwide seemed to use fraudulent appraisals, fake relative gift letters, and aliases, (4) sometimes closing costs were received by Worldwide on the loan, and (5) . . . a number of the properties were foreclosed.

One of the DORA reports noted that Worldwide purchased properties "with the intent to resell to Colorado borrowers" for "a much higher price (sometimes double) than what they purchased the property for, usually only months after the property had been purchased." Additionally, a DORA investigator's memorandum

specifically about Martinez (drafted more than three years before the indictment was filed) listed multiple possible regulatory violations, including a "scheme to defraud," and requested that the case be referred to law enforcement agencies.

¶ 9     Nevertheless, the postconviction court concluded that this evidence was insufficient to show that DORA "either knew or *should* have known of the specific straw buyer scheme(s) at issue" because it did not include the "bank records of [Martinez,] other family members, and Worldwide, from which it would have been apparent that [Martinez] was simply operating as a conduit through whom Worldwide transferred money received from a bank financing a home purchase from a second straw buyer to Worldwide via several layers of transactions."  The court noted that the memorandum about Martinez did not demonstrate knowledge of the straw buyer scheme because it "list[ed] suspected violations of *mortgage loan originator licensing requirements*" and was "devoid of any details explaining the facts underlying the suspected mortgage-loan-originator-based violations," including the scheme to defraud.

## (2) Victims

¶ 10    In 2015, before Martinez accepted her plea agreement, the People learned that some of the lender victims filed suspicious activity reports with the federal government for properties included in the indictment more than three years before the indictment was filed. These reports documented potential issues with appraisals and misrepresentations in the mortgage applications. "[B]ased on the arguable possibility that the [statute of limitations] d[id] in fact bar their use as part of the prosecution for the substantive [t]heft charge," the People moved to dismiss the transactions involving the properties in the suspicious activity reports from the theft charge.[3]

¶ 11    In her Rule 35(c) motion, Martinez contended that the "same recognizable signs of fraud [in the suspicious activity reports] were present in the sales" of the properties that supported the remaining charges, and therefore, the victims for those properties knew or

---

[3] The People did not dismiss these transactions as predicate acts for the COCCA charges. *See* § 18-17-103(3), C.R.S. 2024; *People v. Davis*, 2012 COA 56, ¶ 34 ("[I]f one predicate act falls within its respective limitations period, other predicate acts occurring within ten years before the occurrence of the first can be presented as evidence of racketeering activity even if they could not give rise to a separate prosecution.").

should have known about the facts underlying the criminal charges against her. Alternatively, she argued that the lender victims and straw buyers should have investigated and uncovered those facts during the properties' foreclosure proceedings.

¶ 12     At the hearing, the People's witness testified that title companies, not the lenders, "handle[d] all the money in and out of [the] real estate transactions," and therefore the title companies had the "bank names and account numbers and owner names that [CBI] needed" to uncover the straw buyer scheme. She further testified that the lenders "would have no record or have even asked about" private payoff letters — the method Worldwide used to appropriate the profits from their straw buyer scheme. Crediting this testimony, the postconviction court concluded that, without the information held exclusively by the title companies, "the victim lenders and straw buyers did not and could not have reasonably known that [Martinez] obtained lender funds . . . after the sale to the second straw buyer which were immediately transferred to Worldwide."

### (3) Subpoenaed Documents

¶ 13    In 2010, as part of its investigation into Worldwide, DORA obtained and audited documents relating to approximately thirty-nine real estate transactions involving Worldwide. When Martinez subpoenaed these documents as part of the postconviction proceedings, DORA's records custodian informed her that the documents "were no doubt destroyed long ago." Martinez moved for sanctions for spoilation of evidence under both Crim. P. 16 and the due process clause and argued that the appropriate sanction would be an adverse inference that the destroyed "documents contained information showing illegal activity related to the loans for the properties in question in this matter."

¶ 14    The postconviction court denied the motion, ruling that, because Martinez's conviction "was and is already final, . . . neither DORA nor the prosecution ha[d] any duty under Crim. P. 16 or due process principles to disclose the documents from the DORA audit as part of this Crim. P. 35(c) proceeding." And even if there was a disclosure obligation, the court ruled, Martinez "has presented no evidence that the contents of those documents possessed

exculpatory value that was apparent before those documents were destroyed."

¶ 15    Martinez now appeals the postconviction court's rulings on the applicability of the statute of limitations and her request for discovery sanctions.

## II.    Statute of Limitations

¶ 16    Martinez argues that DORA and the victims knew or should have known of the facts establishing the criminal charges against her more than three years before the indictment was filed.  She contends, therefore, that the statute of limitations had run and the district court lacked subject matter jurisdiction to enter her guilty plea.  After discussing the standard of review and applicable law, we address Martinez's contentions concerning DORA and the victims in turn.

### A.    Standard of Review and Applicable Law

¶ 17    In reviewing the denial of a Rule 35(c) motion after a hearing, we review conclusions of law de novo but defer to the postconviction court's findings of fact if they are supported by the evidence. *People v. Villanueva*, 2016 COA 70, ¶ 28.  "[W]e presume the validity of the conviction and the defendant bears the burden of proving

h[er] claim[] by a preponderance of the evidence." *Dunlap v. People*, 173 P.3d 1054, 1061 (Colo. 2007). "Where the evidence in the record supports the findings and holding of the court, the judgment of the court will not be disturbed on review." *Id.* at 1062.

¶ 18 Under Rule 35(c)(2)(III), a defendant may seek relief on the ground that "the court rendering judgment was without jurisdiction over . . . the subject matter." In Colorado, a statute of limitations challenge in a criminal case implicates the court's subject matter jurisdiction and cannot be waived. *People v. Butler*, 2017 COA 117, ¶ 14.

¶ 19 The limitations period for most felony offenses, including theft and COCCA violations, is three years. § 16-5-401(1)(a), C.R.S. 2024. For the offenses alleged in this case, the applicable limitations period commences "upon *discovery* of the criminal act." § 16-5-401(4.5) (emphasis added).

¶ 20 The purpose of the "discovery" provision, section 16-5-401(4.5), is to

> extend the limitations period for crimes that are susceptible to remaining undetected for extended periods of time, so that prosecution of such crimes will not be foreclosed as a result of concealment. . . . [W]ithout the

discovery tolling provision, our Criminal Code would provide surreptitious defendants a windfall for successfully concealing criminal conduct from their victims, contrary to the General Assembly's intent.

*People v. McKinney*, 99 P.3d 1038, 1044-45 (Colo. 2004) (citation omitted).

¶ 21    In *People v. Cito*, 2012 COA 221, a division of this court interpreted and applied the "discovery" provision of section 16-5-401(4.5).  There, an employee was charged with theft by deception for obtaining money from his employer for unused personal time, when the employee had actually used that time. *Cito*, ¶¶ 4-5.  The district court held that "discovery" of the criminal acts occurred at the time the defendant received the payments from the employer, rather than when the employer discovered that the defendant had lied about his time off.  *Id.* at ¶ 9.  On appeal, a division of this court reversed the district court's decision.  In interpreting the terms "discovery" and "criminal act" in subsection (4.5), the division held that "'discovery of the criminal act' . . . refers to the point at which the victim or the state knew or through the exercise of reasonable diligence should have known of the facts establishing the crime at issue."  *Id.* at ¶ 31.  Noting that "the

criminal act [there] was theft by deception, not merely the act of obtaining the money," the division held that the victims would not have "discover[ed]" the criminal act until they realized they were deceived.  *Id.* at ¶¶ 2, 31.

¶ 22     This case, like *Cito*, involved crimes involving an element of deception or fraud.  *See* § 18-4-401(1), C.R.S. 2024 (theft by deception); 18 U.S.C. § 1344 (bank fraud).  Thus, "discovery of the criminal act" in this case refers to the point at which the victims or the State knew or should have known of facts establishing that Worldwide was (1) using straw buyers to generate fake profits from real estate sales (the fraud or deception) and (2) diverting those profits to itself and its members (obtaining the money).  *See id.* at ¶ 31.

## B.     DORA

¶ 23     Martinez contends that, given the suspicious activity noted in the investigative reports, DORA's investigation triggered the "discovery of the criminal act" for statute of limitations purposes because "DORA either knew or, had it exercised reasonable diligence by further investigating Worldwide, it would have known,

13

of the facts necessary to discover[] the criminal acts in this case."

We are not persuaded for two reasons.

### 1. Actual or Constructive Knowledge

¶ 24 First, we discern no error in the postconviction court's finding that the submitted evidence did not demonstrate that DORA had actual or constructive knowledge of the criminal acts underlying the charges in this case. The court found that there was "no evidence that any of the properties listed as a basis for the charges in the Indictment against [Martinez] were included in the files obtained by DORA" and that DORA was not "aware of the banking records necessary to disclose that private payoff letters were issued to [Martinez], or that [Martinez] then immediately deposited those funds into Worldwide-related accounts." These findings are supported by the record, *see Dunlap*, 173 P.3d at 1062, and Martinez does not meaningfully contest them.[4] And without these documents, DORA could not have known that Worldwide was

---

[4] Martinez suggests that the destroyed documents might have included references to the properties in the indictment and that DORA could have obtained more bank records through its subpoena powers, but these arguments have no bearing on the postconviction court's findings about the evidence submitted for the Crim. P. 35(c) hearing.

14

obtaining profits from the straw buyer scheme — a necessity for discovery of the underlying criminal act. *See Cito*, ¶ 31.

¶ 25 Instead, Martinez contends that DORA's memorandum listing her possible regulatory violations (including a "scheme to defraud") and requesting the matter be referred to law enforcement demonstrates that DORA was aware of Worldwide's scheme. But evidence in the record shows that no referral was never made, and we agree with the postconviction court that the "memorandum is devoid of any details explaining the facts underlying the suspected mortgage-loan-originator-based violations." It is therefore mere speculation that the memorandum's mention of noncriminal regulatory offenses referred to the straw buyer scheme here. Thus, the record supports the postconviction court's finding that DORA did not have actual or constructive knowledge of the facts establishing the criminal acts in this case based on its regulatory investigation, and we will not disturb it. *See id.*

## 2. Duty to Investigate

¶ 26 Second, we reject Martinez's argument that the suspicious information mentioned in DORA's reports obligated DORA to investigate further and that such an investigation would have

uncovered the straw buyer scheme. DORA's Division of Real Estate is a civil agency tasked with "the administration and enforcement of" the civil real estate statutes through "the prosecution of all persons charged with violating any of their provisions" and by "conduct[ing] audits of business accounts of licensees." § 12-10-207(2), C.R.S. 2024. It has the authority to issue sanctions for a licensee's civil violations, including the severe sanction of license suspension or revocation. *See* § 12-10-217(1), C.R.S. 2024.

¶ 27    Here, DORA investigated consumer complaints against Worldwide based on allegations of civil violations of the real estate statutes. As a result of its investigation, DORA revoked or suspended the licenses of several of Worldwide's employees and issued cease and desist orders to the unlicensed members whom it did not have the authority to sanction. Indeed, by 2010, Worldwide had shut down its mortgage loan origination company (but not its realty or investment companies).

¶ 28    Section 12-10-217(10) does require the Division of Real Estate to refer information to law enforcement agencies when it "becomes aware of facts or circumstances that fall within the jurisdiction of a criminal justice or other law enforcement authority upon

16

investigation of the activities of a licensee." But the statute's plain language does not require DORA to expand its investigation beyond violations of the real estate statutes, nor does it require DORA to take action on mere suspicions.

¶ 29 DORA completed its investigation into the consumer complaints levied against Worldwide and issued the most severe sanctions available to it, and Worldwide's mortgage company (which caused the complaints) ceased operating. Under these circumstances, we cannot conclude that it was unreasonable for DORA to end its investigation without looking into other potentially suspicious activity. Therefore, the postconviction court did not err by finding that Martinez "failed to establish by a preponderance of the evidence that [DORA] knew or should have reasonably known of the facts establishing the charges against [her] based on its investigation of real estate and mortgage *licensing* issues before CBI began its detailed investigation into Worldwide and Worldwide's principals."

## C.   Victims

¶ 30 Martinez also contends that the victims — the lenders and the straw buyers — should have known of the facts establishing the

17

criminal charges in this case more than three years before the indictment was filed. Specifically, she argues that the victims should have investigated and would have uncovered the straw buyer scheme if they were reasonably diligent. We disagree.

¶ 31 Even assuming that, to exercise reasonable diligence under the circumstances, the victims should have investigated their transactions with Worldwide, it is speculative that their investigations would have uncovered Worldwide's scheme. The postconviction court found, as supported by the CBI analyst's testimony, that the lenders did not have access to the private payoff letters and bank files needed to discover that Worldwide was diverting the profits from the straw buyer sales to itself. The straw buyers also would not have had the means to acquire these documents. Martinez asserts in conclusory fashion that if the victims "exercised reasonable diligence, they would have known about the criminal activity underlying the[] loans," but she does not explain how they could have done so without these documents.

¶ 32 Thus, we agree with the postconviction court that, because Martinez did not present any evidence that the victims had or could access "information that the profits of the second straw buyer sale

were diverted to [Martinez] and Worldwide via a private payoff letter, . . . [Martinez] has not shown that the victims knew or, through the exercise of reasonable diligence, should have known of the facts establishing" the crimes in this case.[5]  *See Cito*, ¶ 31.

## III.    Motion for Sanctions

¶ 33    Martinez contends that the postconviction court abused its discretion by declining to adopt, as a discovery sanction, her proposed adverse inference that the documents DORA destroyed "contained information showing illegal activity related to the loans for the properties in question in this matter."  She argues that the court should have made this adverse inference finding based on (1) Crim. P. 16(III)(g); (2) due process; and (3) the court's inherent power.[6]  We disagree.

---

[5] Martinez also contends that the bank that provided the fraud hotline tip to CBI knew or should have known about the facts establishing the crimes in this case earlier.  But that bank is not a victim of any of the criminal acts in this case, nor is it the State, so its knowledge is immaterial to the statute of limitations.  *See People v. Cito*, 2012 COA 221, ¶ 2 (referring to "the victim or the state").

[6] The People contend that these arguments, to the extent that they relate to conduct occurring before the postconviction proceedings, were waived by Martinez's guilty plea.  Because we conclude that the postconviction court did not err by denying the motion for sanctions, we need not resolve the People's contention.

## A. Standard of Review

¶ 34 We review a court's resolution of discovery issues and its decision whether to impose sanctions for discovery violations for an abuse of discretion. *People v. Acosta*, 2014 COA 82, ¶ 10. A court abuses its discretion when its discovery order is manifestly arbitrary, unreasonable, or unfair. *People v. Tippet*, 2023 CO 61, ¶ 35.

¶ 35 But "[w]e review de novo to determine whether the state violated a defendant's due process rights" by failing to preserve potentially exculpatory evidence. *People v. Eason*, 2022 COA 54, ¶¶ 37, 40.

## B. Rule 16(III)(g)

¶ 36 Martinez contends that, by failing to obtain and disclose the materials from DORA's audit of Worldwide, the People violated its discovery obligations under Rule 16(I)(a) and (b)(4) that require prosecuting attorneys to make available to defendants certain "material and information which is in the control of the prosecuting attorney . . . and concerning the pending case" and to "ensure that a flow of information is maintained between the various investigative personnel and his or her office sufficient to place

within his or her possession or control all material and information relevant to the accused and the offense charged." Martinez argues that the court should have imposed sanctions under Rule 16(III)(g), which permits a court to remedy a discovery violation by, as relevant here, entering an "order as it deems just under the circumstances."

¶ 37    Martinez's motion did not clearly identify when this supposed disclosure violation occurred. But on appeal, Martinez clarifies that her contention is "that the prosecution never obtained the DORA files or provided them to [her] while the case was still *at the district court level*," and if they had, "the files would have been available for the defense during the postconviction proceedings." Irrespective of when the violation occurred, we conclude that Rule 16 is inapplicable here. *See People v. Cooper*, 2023 COA 113, ¶ 7 (we may affirm the postconviction court's order on any ground supported by the record, whether or not the court relied on or considered that ground).

¶ 38    To the extent Martinez argues that the violation occurred after her guilty plea, the district court was correct that Rule 16 does not apply to postconviction proceedings. *See People v. Owens*, 2014 CO

58M, ¶¶ 13-16; *see also People v. Thompson,* 2020 COA 117, ¶ 33

("Crim. P. 35(c) is not a discovery mechanism to find new evidence,

but, rather, prescribes a procedure to present such evidence when

it has been obtained through other sources.").

¶ 39     As for Martinez's contention that the violation occurred before

her guilty plea, Rule 16(III)(g) allows a court to enter discovery

sanctions if "at any time *during the course of the proceedings it is*

*brought to the attention of the court* that a party has failed to comply

with this rule." (Emphasis added.) Given that Rule 16 is

inapplicable in postconviction proceedings, *Owens,* ¶¶ 13-16,

"during the course of the proceedings" does not include the

pendency of a Rule 35(c) motion. Because Martinez's request for

sanctions under Rule 16 was not made "during the course of the

proceedings," the postconviction court properly denied the motion.

### C.     Due Process

¶ 40     Martinez contends that DORA's destruction of documents

violated her right to due process and therefore warranted discovery

sanctions.

¶ 41     To establish a due process violation based on the State's

failure to preserve potentially exculpatory evidence, Martinez "must

22

prove that the evidence was suppressed or destroyed by state action and that the evidence was material." *Eason*, ¶ 37 (quoting *People v. Braunthal*, 31 P.3d 167, 172 (Colo. 2001)). Specifically, she must show that "(1) the state suppressed or destroyed the evidence; (2) the evidence had an exculpatory value that was apparent before it was destroyed; and (3) [s]he was unable to obtain comparable evidence by other reasonably available means." *Id.*

¶ 42 To the extent that Martinez argues that the violation occurred after her guilty plea, the postconviction court was correct that "neither DORA nor the prosecution" had a duty "to disclose the documents from the DORA audit as part of this Crim. P. 35(c) proceeding." The constitutional requirement to preserve and disclose potentially exculpatory evidence ordinarily ends when a conviction becomes final. *See Dist. Attorney's Off. v. Osborne*, 557 U.S. 52, 68-69 (2009).

¶ 43 Additionally, the postconviction court found that Martinez "presented no evidence that the contents of [the destroyed] documents possessed exculpatory value that was apparent before those documents were destroyed." The court reasoned that DORA

23

wrote reports based in part on the documents it collected during the audit, which formed the basis for agency actions it took against Worldwide principals under its jurisdiction. These reports mention specific properties. It is reasonable to conclude that the properties included in the reports were associated with the most inculpatory actions taken by . . . licensees who worked at Worldwide. Yet, the properties that form the basis of the Indictment are not mentioned in these reports. The Court therefore infers either (1) that the audited documents did not contain the properties in the Indictment or (2) that if those properties were included in the audited documents, they were not sufficiently inculpatory (meaning exculpatory for statute of limitations purposes) for [DORA] to base agency actions on them.

¶ 44     We agree with the court's reasoning and defer to the reasonable inferences it drew from the record. *See Dunlap*, 173 P.3d at 1062. Martinez's assertion that the destroyed documents had exculpatory value because they included documentation showing obvious signs of fraud regarding the properties underlying this case is speculative and contrary to the postconviction court's findings. Such speculation is insufficient to establish a due process violation. *See Eason*, ¶ 48.

¶ 45    Under these circumstances, we cannot conclude that Martinez's due process rights were violated. The district court thus did not err by denying her motion for sanctions on that basis.

## D.    Inherent Powers

¶ 46    Finally, Martinez cites *Aloi v. Union Pacific Railroad Corp.*, 129 P.3d 999 (Colo. 2006), and *Pfantz v. Kmart Corp.*, 85 P.3d 564 (Colo. App. 2003) — cases addressing a court's inherent power to issue sanctions for spoliation of evidence *in civil cases* — to contend that the postconviction court should have made an adverse inference finding. Martinez has not provided any authority, nor are we aware of any, holding that case law governing sanctions for spoliation of evidence in civil cases is applicable to Rule 35(c) proceedings or criminal cases. Accordingly, the postconviction court did not err by declining to enter sanctions on this basis either.

## IV.    Disposition

¶ 47    The order is affirmed.

JUDGE J. JONES and JUDGE BROWN concur.